Filed 5/29/14  P. v. Toomalatai CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B250672 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA082939) |
| v. | |
| JOHN TOOMALATAI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Gary J. Ferrari, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant and appellant John Toomalatai (defendant) was convicted of three counts of forcible oral copulation (Pen. Code, § 288a, subd. (c)(2)[1]), two counts of sexual penetration by a foreign object (§ 289, subd. (a)(2)), and one count of forcible rape (§ 261, subd. (a)(2)). On appeal, defendant contends that the trial court erred when it did not suspend the trial when he claimed incapacity. We affirm the judgment.

## BACKGROUND

### A. Factual Background[2]

The victim, A.M., testified that she agreed to drive with defendant from a gambling casino and that while in the car, defendant forced her to engage in sex, and, against her will, forcibly engaged in other sex acts with her. A.M. underwent a sexual assault examination. The nurse practitioner believed that certain injuries to A.M. were consistent with a sexual assault. DNA extracted from A.M.'s sexual response forensic kit matched the DNA obtained from defendant. Defendant testified that the sex was consensual.

### B. Procedural Background

Following trial, the jury found defendant guilty of three counts of forcible oral copulation in violation of section 288a, subdivision (c)(2) (counts 6, 8 and 9), two counts of sexual penetration by a foreign object in violation of section 289, subdivision (a)(2) (counts 10 and 11), and one count of forcible rape in violation of section 261, subdivision (a)(2) (count 7). The trial court sentenced defendant to state prison for a term of 48

---

[1] All statutory citations are to the Penal Code unless otherwise noted.

[2] Because the facts are not necessary for the issue on appeal, we just provide a brief recitation of them as they relate to the counts on which defendant was convicted.

years, consisting of a term of 8 years for each of the 6 counts for which defendant was convicted.

## DISCUSSION

Defendant contends that the trial court erred when it refused to suspend the trial when he was incapacitated and unable to assist in his defense. We disagree.

### A.      Standard of Review

"An appellate court applies the independent or de novo standard of review to a trial court's exclusion of a criminal defendant from trial, either in whole or in part, insofar as the trial court's decision entails a measurement of the facts against the law." (*People v. Waidla* (2000) 22 Cal.4th 690, 741.)

### B.      Relevant Facts and Proceedings

#### 1.      First Trial Proceedings

On March 18, 2013, the case was called for jury trial, and the trial court told the jurors that the time estimate for the case was 10 days. On March 20, 2013, during jury selection, the trial court was informed that defendant had been attacked in the county jail and had been transported to the hospital. According to the court bailiff, a Sheriff's deputy at defendant's jail told him that defendant suffered "an extremely deep cut in his face that goes down his neck into his shoulder to his chest." The trial court suspended the trial proceedings for the remainder of the day on March 20, 2013, and on March 21, and 22, 2013, because of defendant's medical condition.

On Monday, March 25, 2013, because of defendant's medical condition, the trial court granted defendant's motion to start the trial "all over again with another panel" and dismissed the jury. Defendant waived his right to a speedy trial, and the trial court continued the trial to April 2, 2013.

## 2. *Second Trial Proceedings*

On April 2, 2013, the parties returned to court, and defense counsel stated that defendant believed he could start trial the next day.  On April 3, 2013, the case was again called for jury trial, jury selection began, and the trial court told the new prospective jurors that the trial was estimated to last 10 court days.  The jury was selected on Friday, April 5, 2013, and on April 8, 2013, opening statements were made and the prosecution began its presentation of evidence.

On April 9, 2013, during trial, the trial court told defendant, "You don't look so good," and defendant's counsel stated that defendant had to go to the bathroom "again."  The trial court responded, "This isn't going to work."  The trial court "put [defendant] over" until April 10, 2013, and ordered the jury and A.M. to return then.  The trial court and counsel discussed jury instructions during the remainder of that morning, and at noon the case was matter adjourned until the next day.

On April 10, 2013, the trial court stated that defendant was in the hospital because he was suffering from influenza.  Counsel and the trial court conferred in chambers regarding defendant's medical condition, and the trial court instructed the jury to return on April 11, 2013.

On Thursday, April 11, 2013, defendant was in court, but defendant's counsel stated that he did not believe defendant was "in shape" to be at the trial that day.  Defendant's counsel stated that defendant told him defendant was "coughing up" blood, blood was coming out of his nose, and he was still suffering from diarrhea.  Defendant had blood-stained Kleenex tissues with him in court, and defendant's counsel stated that defendant was vomiting, and defendant said that he had a headache.  Defendant's counsel stated, "[R]ecovery from the flu can take any amount of time . . . from a couple of days to a couple of weeks."  Defendant's counsel stated that, during the course of the trial, defendant had been taking notes, participating with counsel, reading materials, and had shown an interest in his case.  Defendant's counsel said defendant needed to review a transcript of defendant's police interview before deciding whether to testify, but defendant could not read it and told defendant's counsel that he could not concentrate and

4

just wanted to sleep. Defendant's counsel described defendant as being "just miserable," and said that he did he did not believe defendant would be able to testify in his current state.

The prosecutor conceded that defendant had a "health problem," but noted that there was a "critical witness" that is available that day or the following morning, but would be lost "as of Monday" and would not be available through Wednesday or possibly Thursday. The court was scheduled to be dark on Thursday and Friday that week.

Counsel and the trial court had an off-the-record discussion in chambers. On the record, the prosecutor stated that she would contact a nurse "who seems to be the rainmaker over at county jail" and see if a medical examination of defendant could be expedited to determine "an ETA." The trial court instructed the jury to return on April 12, 2013.

On Friday, April 12, 2013, defendant was present in court. The prosecutor stated that she had five witnesses, including A.M., available to testify that day. The prosecutor estimated that her case-in-chief would be completed by "the end of Monday or by Tuesday morning." Defendant's counsel responded, "That's fine as far as that goes. [¶] [The] only decision, as I've indicated, [that] has to be made . . . [is] whether or not my client is going to testify. [¶] I indicated to the court that I need time to discuss it with him." The trial court stated, "All right. I see no reason why we shouldn't push on."

The prosecutor stated that she had received a message from the chief physician at the county jail, who stated that defendant had been examined by a doctor the prior afternoon, and based on that examination, "whatever issues that the defendant had by way of diarrhea, vomiting and other abdominal issues, had resolved. [Defendant] had no further complaints yesterday." The prosecutor also stated the supervising staff nurse at the jail said the prior day that they did not have a record of defendant being hospitalized the day before for influenza. The supervising staff nurse had records that defendant had been seen in the jail clinic for the influenza, blood tests had been run, and defendant had been "cleared to come to court at 6:42 a.m. yesterday." The prosecutor stated that the chief physician at the county jail said, "[I]f there was some sort of gastrointestinal

5

problems, . . . the safest day for him to return . . . in terms of contagion would be Tuesday."

Defendant's counsel said that defendant told him that morning "there were some issues," but defendant would "try to get through the day." Defendant said that he would try to concentrate and would let his counsel know "if there is difficulty." The trial court noted that the jury had been given a 10-day trial estimate and it appeared the trial would extend beyond that estimate.

After the "noon break" on April 12, 2013, defendant's counsel said that defendant told him that he believed he was having a migraine headache and defendant described it as his feeling like "somebody came upside his head with a 2 by 4 and smashed him." Defendant's counsel said defendant was having difficulty concentrating. Defendant's counsel said that defendant showed him three types of medication, but neither defendant nor defendant's counsel "kn[ew] what they [were] for."

Defendant's counsel said that defendant had given him notes throughout the trial, but defendant had stopped doing so for the last half hour before the lunch break. Defendant's counsel said that defendant told him he stopped doing so because he could not concentrate. Defendant's counsel said that he attempted to discuss some trial issues and the nature of the case with defendant, but defendant was unable to discuss them. Previously, defendant had always been attentive and responsive.

The trial court said to defendant's counsel, "The only thing we're asking is that your client hang in for a couple hours—actually less than a couple hours, about an hour and a half this afternoon. [¶] . . . [¶] I don't think that's much to ask."

The prosecutor stated, "This case has been continued for years because of [defendant's] health problems and we hear that he's got debilitating issues and we'll get the reports back from county jail and they will say that he is cleared to go court. [¶] Two days ago, Your Honor, we received a report from county or we heard in terms of talking to people saying he was cleared to come to court two days ago or yesterday. He comes in yesterday, he says, 'I'm coughing up blood.' He's offered 911 by the sheriffs, he refuses it. [¶] He's again offered 911 later, the paramedics are brought here before he's put on

6

the bus, [but] he refuses it. [¶] He's seen yesterday. The word that we're getting from the jails is that he complained of abdominal problems but that they had resolved. His blood tests came back good[;] he was cleared to come to court. [¶] Now we get in here today, we put on four witnesses and suddenly he can't seem to go on. [¶] Your Honor, he's very well aware that we are dangerously close to losing jurors in this case. We have put on 11 witnesses to date in this case and to just give up this case now means that not only do the People have to ask the 3rd and final victim in this case to come back to court—she's already come to court this week three times, but we would also have to have two other victims, who already had to relive with them on the stand in front of a group of 12 strangers, have to do it all over again. [¶] I do not believe that that is a situation, number one, where we should dismiss this jury and start over. The People are very close to the end of our case in chief. [¶] . . . [¶] He's only being asked to participate for less than two hours this afternoon. And I would ask that we proceed."

Defendant's counsel conceded that defendant had been cleared to come to court the previous day. Defendant's counsel argued however that he and the bailiff saw blood on defendant's tissues, and the prosecutor had medical notes indicating that defendant "might not be better until Monday or Tuesday healthwise." The prosecutor responded that the medical records showed that defendant's "issues have been resolved . . . [and] the most optimal date [for his return in terms of contagion] was on Tuesday. [¶] [T]he paperwork . . . showed that [defendant] was clear to come to court today after he was examined once again by a health practitioner. [¶] And the fact that [defendant] was coughing up blood doesn't diminish or negate that fact that when he was offered 911 at this courthouse, not once by the Sheriffs but a second time by the paramedics, he refused both times, he didn't feel like he wanted 911."

The trial court asked defendant if he could "hang on for another hour," and defendant stated, "I can't. I tried. I'll try. I pushed myself this morning to come, I really pushed myself to come today. I didn't want to come today. I pushed—I pushed myself today." The trial court stated, "Well, I'm going to mush ahead, [defendant's counsel]. We'll see how it goes. If we have to quit a little early, we have to quit a little early.

7

We're only going to be in session another hour and 15 minutes." Defendant then stated, "It's really killing me. This is really killing me."

After the court asked that the jurors be brought into the courtroom, in the presence of the jury, defendant stated, "I have a headache. I have a headache." The trial court asked the jurors to step outside the courtroom, and suggested that defendant "waive his appearance for this afternoon." After defendant's counsel spoke to defendant, defendant stated, "Your Honor, I—I want to be present for my thing. I'll try to make do."

The trial court said to defendant, "We're not going for long." Defendant replied, "I just—I just want to go back there. I've got the most killingest (as spoken) headache and it's on so bad, I don't want to make excuse, I just want to go back down there and lay down. [¶] I'm not doing this because I do want to be present. But I want to be able to focus, Your Honor. I'm not trying to make an excuse. I've got a real bad headache. I can't sit here, you know. I really can't. You know, I'm asking mercy of the court. I can't. I have a real bad headache. I can't sit here." The prosecutor argued that three of the victims "suffered health issues," but they nonetheless came to court even though "they ha[d not] felt like it," and one of the victims had come to court for the "4th time this week."

The court stated, "I think we're going to have to at least try to start with A.M. and see how far we get. If we have to break early, we'll break early. I, at least, want to start with her and finish with her on Monday." The trial court called the jury back into the court room and told the jurors, "Folks, we're going to mush on for as long as we can, but by no means we're going to be here any longer than 3 o'clock."

A.M. then testified on behalf of the People. During A.M.'s cross-examination, the trial court recessed proceedings for the day and ordered the jurors and A.M. to return to court on Monday, April 15, 2013.

## C. Analysis

"The California Supreme Court has summarized the law relating to a criminal defendant's right to be present at proceeding as follows: "'A criminal defendant's right

8

to be personally present at trial is guaranteed under the federal Constitution by the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment. It is also required by section 15 of article I of the California Constitution and by sections 977 and 1043." [Citation.] "Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent 'interference with [his] opportunity for effective cross-examination.'" [Citation.] "Due process guarantees the right to be present at any 'stage that is critical to [the] outcome' and where the defendant's 'presence would contribute to the fairness of the procedure.'" [Citation.] "'The state constitutional right to be present at trial is generally coextensive with the federal due process right. [Citations.]' [Citation.]"'" (*People v. Johnson* (2013) 221 Cal.App.4th 943, 948.) A criminal defendant's right to be personally present at trial requires that defendant be both physically and mentally present. (*People v. Avila* (2004) 117 Cal.App.4th 771, 777.)

"Illness of the defendant constitutes good cause sufficient to grant a motion for a mistrial or a request to continue the trial. [Citations.]" (*People v. Avila*, *supra*, 117 Cal.App.4th at p. 777.) In determining whether the trial court properly refused to suspend proceedings due to a defendant's claimed ill health, a reviewing court determines whether the record supports defendant's contention that he was unable to comprehend the nature of the proceedings or to assist counsel in his defense. (*Id*. at pp. 777-778.) Because the trial court, however, can see and hear the defendant, it can "tell far better than [the appellate court] can tell from a cold record whether defendant was able to proceed." (*People v. Rogers* (1957) 150 Cal.App.2d 403, 415.) "Cases in which the accused was determined to be 'mentally absent' from trial are rare and involve extreme situations." (*People v. Avila*, *supra*, 117 Cal.App.4th at p. 779.)

After the second trial proceeding commenced, the trial court suspended the proceedings on April 9, 10, and 11, 2013, because of defendant's medical condition. There is sufficient evidence to support the trial court's determination that on April 12, 2013, defendant was not incapacitated such that he was not mentally present at the trial.

9

On the morning of April 12, 2013, the prosecutor stated that the supervising staff nurse at the county jail said defendant had been seen in the jail clinic for the influenza, and defendant had been "cleared to come to court" in the morning April 11, 2013. The prosecutor also said that she was told by the chief physician at the county jail that defendant has been examined in the afternoon of April 11, 2013, and based that examination, "whatever issues that the defendant had by way of diarrhea, vomiting and other abdominal issues, had resolved. [Defendant] had no further complaints yesterday." The prosecutor stated that the chief physician also said, "[I]f there was some sort of gastrointestinal problems, . . . the safest day for him to return . . . in terms of contagion would be Tuesday."

Defendant contends that the chief physician's statement that it was best to wait another four days for defendant to return to court shows that defendant was incapacitated. The chief physician told the prosecutor that defendant's abdominal issues had been resolved, but "if" defendant had "some sort of gastrointestinal problems," the "safest day" for defendant to return to court, "in terms of contagion," was four days later. The chief physician did not tell the prosecutor that defendant was incapacitated and unable to be mentally present at the trial on April 12, 2013.

In the morning of Friday, April 12, 2013, the prosecutor told the trial court that she estimated her case-in-chief would be completed by "the end of Monday or by Tuesday morning," and defendant's counsel responded, "That's fine as far as that goes. "The trial court stated, without objection by defendant, "All right. I see no reason why we shouldn't push on." Defendant's counsel said that defendant told him that morning "there were some issues" but defendant would "try to get through the day." Defendant said that he would let his counsel know if he had difficulty concentrating, but neither defendant nor his counsel advised the trial court during the April 12, 2013, morning session of trial that defendant was unable to concentrate on the proceedings.

After the "noon break" on April 12, 2013, defendant's counsel said that defendant told him that he believed he was having a migraine headache, and that defendant said he was in pain and was having difficulty concentrating. Defendant's pain, however, "does

10

not establish incompetence or mental absence." (*People v. Avila*, *supra*, 117 Cal.App.4th at p. 780.) In addition, the trial court only asked defendant to bear his migraine headache pain for a short time during the trial. The trial court asked defendant to "hang in there" for "about an hour and a half' after which time the trial court would adjourn the proceedings for the day. The trial court also told the jurors, "[B]y no means [are we] going to be here [for the trial proceedings today] any longer than 3 o'clock."

Although defendant's counsel said that defendant told him defendant was having difficulty concentrating, defendant understood and appropriately responded to the trial court's questions. Defendant's responses to the trial court's questions did not indicate that he was unable to understand the nature of the proceedings or to assist counsel.

Defendant's attorney stated that defendant had stopped giving him notes and did not appear to be able to discuss trial issues. "Defense counsel's opinion concerning his client's mental state [however] is not conclusive. . . . Although statements of counsel are 'to be given serious consideration, there is no good reason why it should control over other circumstances which the court may take into consideration.' [Citation.]" (*People v. Avila*, *supra*, 117 Cal.App.4th at p. 780.)

In addition, defendant's counsel said that defendant showed him three types of medication that defendant was taking. However, neither defendant nor defendant's counsel knew "what they [were] for" There is also nothing in the record that defendant took any of the medication that day, that the medication affected defendant's ability to concentrate, or that the medication altered defendant's ability to comprehend the proceedings or interact with his attorney.

In anticipation of taking testimony for approximately one and a half hours that afternoon, the trial court said, "We'll see how it goes. If we have to quit a little early, we have to quit a little early." The trial court also said it will "try to start with A.M. and see how far we get. If we have to break early, we'll break early." While the afternoon testimony was adduced, defendant did not advise the trial court that his medical condition had worsened and he was unable to assist in his defense.

Even if the trial court erred in failing to suspend the trial to allow defendant to be mentally present at it, it was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 22, 24.) "The California Supreme Court . . . has explained, 'Erroneous exclusion of the defendant is not structural error that is reversible per se, but trial error that is reversible only if the defendant proves prejudice. [Citations.]' [Citation.] '"A defendant claiming a violation of the right to personal presence at trial bears the burden of demonstrating that [the defendant's] personal presence could have substantially benefited the defense. [Citation.]" [Citations.]' [Citations.] . . . [A]n error pertaining to defendant's presence involving a federal constitutional right is evaluated under the 'harmless-beyond-a-reasonable-doubt standard.' [Citations.]" (*People v. Johnson*, *supra*, 221 Cal.App.4th at pp. 949-950.)

Although defendant asserts that he was unable to assist his attorney during the crucial cross-examination of A.M. that occurred during the afternoon session of April 12, 2013, her cross-examination continued three days later (on April 15, 2013), and there is nothing in the record to indicate defendant was having a migraine or any health problems that day. Defendant also does not contend what he would have said or done had he not had a migraine headache during the first day of A.M.'s testimony. Finally, A.M.'s trial testimony was substantially the same as she had previously given during the preliminary hearing, and there is nothing in the record to show that defendant's counsel had been unable previously to confer with defendant regarding her likely trial testimony. (*People v. Mayham* (2013) 212 Cal.App.4th 847, 858.)

12

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


                                        MOSK, Acting P. J.


We concur:


        KRIEGLER, J.


        MINK, J.[*]

---

[*]     Retired Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.